1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                         **DISTRICT OF NEVADA**

10

11   DAVID and BONNIE LITTLE, et al.,  )        3:13-cv-00046-HDM-WGC
                                        )
12                    Plaintiffs,       )
                                        )        ORDER
13   vs.                                )
                                        )
14   HILDA L. SOLIS, et al.,            )
                                        )
15                    Defendants.       )
     _____)
16
          Before the court is plaintiff Western Range Association's
17
     ("WRA") Motion for Fees and Costs Pursuant to the Equal Access to
18
     Justice Act, 28 U.S.C. § 2412(d)(1)(A) (#42).  The defendants, the
19
     United States Secretary of Labor, the United States Assistant
20
     Secretary of Labor, and the Acting Deputy Administrator of the Wage
21
     and Hour Division of the United States Department of Labor, have
22
     opposed (#48).  The plaintiff has replied (#51).
23
     **Factual and Procedural Background**
24
          Plaintiffs are "individual sheep producers and organizers of
25
     sheep producers." (P. Mot. 2.)  On January 8, 2013, the defendants
26
     issued a Federal Register Notice that raised the adverse effect
27
     wage rate ("AEWR") of sheepherders substantially in several Western
28

                                        1

states.  (*Id.*)  For example, the federally mandated wage rates for sheepherders in Nevada would have been raised by 78%, and the rates in Arizona would have been raised by 90%.  (*Id.*)

Plaintiffs filed a complaint on January 29, 2013 claiming that the wage rates were arbitrary and capricious in violation of the Administrative Procedures Act.  Plaintiffs sought emergency injunctive relief from the court.  Following a hearing regarding Plaintiffs' request for a temporary restraining order, the parties entered into a stipulation that was "incorporated herein by reference" into a court order on February 4, 2013.

Under the terms of the stipulation, the plaintiffs withdrew their motion for a temporary restraining order and preliminary injunction without prejudice, while the defendants agreed not to implement or enforce the wage rates with respect to sheepherding announced in the January 8 Federal Register in Nevada, Arizona, Oregon, and Washington "until and unless the Court enters judgment on the merits in favor of the validity of the Notice." (Order, Doc. #21.)  The parties also agreed to an expedited dispositive motions timeline, and that the defendants would file the administrative record on or before February 22, 2013.

Defendants did file the administrative record on February 22, 2013, along with an unsworn declaration providing the Department of Labor's ("DOL")'s rationale for promulgating the January 8 Federal Register Notice.  Then, on March 28, 2013, the DOL promulgated a new Federal Register Notice rescinding the January 8 Notice and setting the AEWRs back prior to the levels before the January 8 Notice.  The new Notice also stated that the relevant State Workforce Agencies ("SWAs") were currently collecting new wage data

for the occupations and geographic locations in question, and that that the DOL would eventually issue new AEWRs based on the new data.  (D. Resp. 4.)

On April 19, 2013, the plaintiffs moved for summary judgment. On the same day, the defendants filed a "Motion to Dismiss for Lack of Subject Matter Jurisdiction or Failure to Exhaust Administrative Remedies."  The defendants argued that the case was moot, and that the "voluntary cessation" exception to mootness did not apply because "[t]he Ninth Circuit has held that an agency's adoption of a new rule or policy that resolves the plaintiff's legal challenge is enough to moot the case."  (Def. Mot. Dismiss 13.)  Defendants argued that the March 28 Notice completely nullified the January 8 Notice and constituted an adoption of a new rule or policy that resolved the plaintiffs' legal challenge.  (*Id.* 13-14 ("The Federal Register Notice demonstrates that DOL did not voluntarily cease applying the January 8 AEWR.  Rather, it issued a new, final wage rate determination setting Plaintiffs obligations under the statute, which rescinded the January 8 rates.  Thus, the issuance of DOL's new, final rule moots this case.").)

On May 10, 2013, the plaintiffs then filed a document titled "Plaintiffs' Suggestion of Mootness," in which they "respectfully submit[ted] that this case ha[d] been mooted by the Department of Labor's ("DOL") involuntary cessation of its illegal activity." (P. Suggestion of Mootness 1.)  Plaintiffs "reserve[d] the right to file another lawsuit should DOL resume its unlawful conduct."  (*Id.* 2.)

On May 16, 2013, the court issued an order granting "the defendants' unopposed motion to dismiss . . . this action as moot."

3

1  (ECF #41.)  The plaintiffs then filed for attorneys' fees and

2  costs, and that motion is now before the court.

3  **Standard**

4       Under the Equal Access to Justice Act ("EAJA"),

5       [e]xcept as otherwise specifically provided by statute, a
        court shall award to a prevailing party other than the United
6       States fees and other expenses, in addition to any costs
        awarded pursuant to subsection (a), incurred by that party in
7       any civil action (other than cases sounding in tort),
        including proceedings for judicial review of agency action,
8       brought by or against the United States in any court having
        jurisdiction of that action, unless the court finds that the
9       position of the United States was substantially justified or
        that special circumstances make an award unjust.

10
   28 U.S.C. § 2412(d)(1)(A).  A "party" that may recover under the
11
   EAJA is defined to include
12
        any owner of an unincorporated business, or any partnership,
13      corporation, association, unit of local government, or
        organization, the net worth of which did not exceed $7,000,000
14      at the time the civil action was filed, and which had not more
        than 500 employees at the time the civil action was filed.
15
   *Id.* at § 2412(d)(2)(B)(ii).  Thus, to prevail on an EAJA fees and
16
   costs claim, a party must meet the EAJA definition of a "party" and
17
   must have "prevail[ed]," while the position of the United States
18
   must be found not to have been "substantially justified," and there
19
   must be "no special circumstances mak[ing] an award unjust."  *Id.*;
20
   *Id.* at § (d)(1)(A).
21
   **I.  Is WRA a "Party" Eligible to Recover Attorneys' Fees Under the
22      EAJA?**

23       WRA operates as a member association.  WRA applies for H-2A

24  visas for foreign sheepherders, and then facilitates their

25  employment at its member organizations, which are sheep ranches.

26  The Immigration and Nationality Act provides for the H-2A program,

27  which allows foreign workers to obtain visas to perform

28  agricultural labor or services of a temporary or seasonal nature in

                                    4

the United States.  *See* 8 U.S.C. § 1101(a)(15)(H).  H-2A visas can only be granted when there are "not sufficient workers . . . to perform the labor or services involved" and "the employment of the [foreign workers] . . . will not adversely affect the wages and working conditions of workers in the United States similarly employed."  8 U.S.C. § 1188(a)(1).

Ninth Circuit case law is quite clear that when determining if a member association is eligible for attorneys' fees under the EAJA, whether the individual member organizations themselves meet the requirements of being a party eligible to recover under the EAJA is not relevant.  *See Love v. Reilly*, 924 F.2d 1492, 1494 (9th Cir. 1991).  The court must determine the "party in interest," and the members are parties in interest only if they are liable for the attorneys' fees.  *See id.* (citing *Unification Church v. I.N.S.*, 762 F.2d 1077, 1082 (D.C. Cir. 1985)).  If only the member association bears the cost of the litigation (*see* P. Mot. 5), the member association is the party in interest and the size and net worth of the individual member organizations need not be considered.  *See Love*, 924 F.2d at 1494.

Here, WRA admits it is responsible for all of the attorneys' fees in this litigation and that it is the real party in interest. (P. Mot. 5.)  It must therefore show that it qualifies as a party under the EAJA.  Moreover, the size and net worth of the member ranch organizations are not relevant to the inquiry of whether WRA is an eligible "party" under the EAJA.  *Love*, 924 F.2d at 1494*.* WRA asserts in its motion that its members' size and net worth are not relevant, and the DOL does not contest this particular point. (*See* P. Mot. 5; D. Opp'n 5-11.)

a.  *Was WRA's net worth less than $7,000,000 at the time this lawsuit was filed?*

WRA asserts that it meets the first requirement of 28 U.S.C. § 2412(d)(2)(B)(ii) by having a net worth of "far below the $7,000,000 maximum at the time of filing the complaint and all times since then."  (P. Mot. 4.)  The only support for this is a declaration from Dennis Richins, the Executive Director of WRA since 2001.  (Richins Dec. ¶ 3.)

The defendants argue that WRA's "unsupported statements are not sufficient to meet WRA's burden under EAJA."  (Def. Opp'n 5.) In support of this argument, the defendants cite two cases.  The first is a Ninth Circuit case, *Thomas v. Peterson*.  In *Thomas*, the court found that a plaintiff's affidavit was not sufficient to establish that it was an organization eligible for fees under the EAJA.  *Thomas v. Peterson*, 841 F.2d 332, 337 (9th Cir. 1998). However, while the court did criticize the sparse nature of the affidavit, the fault the court found seems to be that the affidavit only addressed the net worth of the organization and did not address the organization's size.  *Id.* ("The government correctly notes that the affidavit of the assistant director of the Idaho Conservation League, the plaintiff that filed the fee application, shows only that the League is a 'non-profit, public interest corporation' which is worth less than $1 million, but not that the League employs fewer than 500 employees.  We agree that the affidavit is not sufficient to establish that the League is eligible for fees." (internal citations omitted).)  Thus, *Thomas* does not actually stand for the proposition that an affidavit alone is not enough to show EAJA party eligibility; rather, it holds that

both elements of EAJA party qualification – net worth and the number of employees – must be established by the plaintiff by competent evidence.

The other case cited by the defendants is *Impresa Construzioni Geom. Domenico Garufi v. United States*. The *Impresa* court did hold that the plaintiffs in an EAJA action must show significant "documentary evidence" regarding both the size and the net worth of their organization. 89 Fed. Cl. 449, 451 (2009). With regard to the size of the organization, the *Impresa* court concluded that a "bare statement" was not enough and that "substantiating documentation" was necessary. *Id.* Additionally, *Impresa* held that "affidavits which are 'self-serving' and 'unsupported,' including those that contain unaudited balance sheets, are not sufficient to establish net worth." *Id.*

*Impresa* is a case from the United States Court of Federal Claims. As WRA points out in its reply, there does not appear to be any correlating Ninth Circuit authority. (*See* P. Reply 4 n.2.) While case law from the Court of Federal Claims may be instructive, it is not binding on this court. Nevertheless the court is persuaded that WRA's affidavit is self serving and unsupported and therefore insufficient to establish that WRA meets the first requirement under the EAJA. While the plaintiff seeks leave of court to supplement the record on this issue if the court finds its documentation insufficient (*see id.*), the court does not need to address the issue further because WRA does not meet the second element of the party qualification under the EAJA, discussed below.

b. *Did WRA employ no more than 500 employees at the time this lawsuit was filed?*

1   WRA asserts that it has only 8 employees, who work in its Salt

2   Lake City Office.  (P. Mot. 4; Richins Dec. ¶ 5.)  WRA explains,

3   however, that

> for the purposes of submitting H-2A applications under DOL'S
> "special procedures: for sheepherders, WRA is referred to as a
> "joint employer" of H-2A sheepherders with the individual
> employer members.  Richins Dec. ¶ 4.  In the "special
> procedures," DOL specifically recognizes the "specific tasks
> and responsibilities" that WRA "performs and assumes on behalf
> of the individual rancher members.  *Id.*  DOL concludes that
> "The WRA operates as a joint employer solely for H-2A program
> purposes."[1]  *Id.*"

9   (P. Mot. 4.)  WRA's position is that "[t]he sheepherders are

10  employed by the individual sheep producer members; WRA's role is

11  simply an accommodation under the H-2A special procedures to permit

12  an H-2A visa holder sheepherder to change from one WRA member to

13  another as weather, lambing seasons, and other factors require."

14  (*Id.*)  WRA explains that compliance with the DOL's "special

15  procedures" means it is identified as a "joint employer" of more

16  than 800 H-2A workers at any given time.  (*Id.*)  However, WRA

17  claims that its "joint employer solely for H-2A program purposes"

18  status does not render it ineligible for EAJA recovery, and that it

19  truly only has 8 employees.  (*Id.*)

20   In response the defendant asserts that WRA's status as a joint

21  employer of more than 800 H-2A workers means that it is does not

22  meet the definition of a "party" eligible for recovery under the

23  EAJA.  The defendants deny that WRA's role is simply one of

24  "facilitation" and argue that the WRA's activities with regard to

25

26  [1] The DOL's language that "WRA operates as a joint employer solely for H-2A
    program purposes" comes from page 8 of a document titled "Special Procedures
27  for Labor Certification Process for Sheepherders and Goatherders Under the
    H-2A Program," issued by DOL as part of Field Memorandum FM 24-01, published
28  on August 1, 2001.  *Id.*  The document is attached as Exhibit A to the
    Richins Declaration.

the foreign sheepherders do constitute those of an employer.

Defendant point out that "[a]ssociations like WRA that file master applications with DOL for H-2A workers on behalf of employer-associated members necessarily assume the status of a joint employer by virtue of their control over the H-2A recruiting and employment process, *see* 20 C.F.R. § 655.131(b), which includes joint employer association filings for H-2A sheepherding occupations, *see* 76 Fed. Reg. at 47,260-61."  (Def. Opp'n 7-8.)  The defendant further notes that "[t]he regulations define an employer as an 'association' having an employer relationship with H-2A workers, as evidenced by 'the ability to hire, pay, fire, supervise or otherwise control the work of the employee.'" (Def. Opp'n 8 n.3 (quoting 20 C.F.R. § 655.103(b))).  Additionally, "joint employment" exists under the regulations "[w]here two or more employers each have sufficient definitional indicia of being an employer to be considered the employer of a worker . . . Each employer in a joint employment relationship to a worker is considered a joint employer of that worker."  20 C.F.R. § 655.103(b).

*i. Ruiz* and the Ninth Circuit "Economic Realities Test" as articulated in *Bonnette*

The defendant details the many activities related to the H-2A workers that the plaintiff undertakes beyond simply "facilitation," heavily citing to a recent and as-of-yet unpublished[2] Eastern District of Washington case, *Ruiz v. Fernandez*.  (*See* Def. Opp'n 7-10.)  In *Ruiz*, Chilean sheepherders who came to the U.S. under the H-2A program sued both WRA and an individual member ranch for

_____

[2]  As an unpublished decision from a different federal district, Ruiz is persuasive authority but is not binding on this court.

violations of Washington State wage law, breach of employment
contracts, and violations of the Fair Labor Standards Act (FLSA),
among other claims. *Ruiz v. Fernandez*, No. CV-11-3088-RMP, 2013 WL
2467722, at *2 (E.D. Wash. June 7, 2013). Applying the Ninth
Circuit "economic realities test," and determining that the
economic realities factors used in *Bonnette v. Cal. Health &*
*Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983), as opposed to those
applied in *Torres-Lopez v. May*, 111 F.3d 633 (9th Cir. 1997), were
the most relevant to its analysis, the *Ruiz* court found that WRA
was indeed a joint employer under FLSA. *See Ruiz*, 2013 WL 2467722,
at *7-8, *14; *see also* Def. Opp'n 9-10. The Ninth Circuit in
*Bonnette* analyzed whether state and county welfare agencies were
joint employees of "chore workers" who provided in-home domestic
services to disabled persons, a fact pattern the *Ruiz* court found
quite similar to the question of whether the H-2A sheepherders are
joint employees of WRA. *See Ruiz*, 2013 WL 2467722, at *8.

   The four factors used in *Bonnette* to analyze whether or not
WRA was a FLSA employer, were "whether the alleged employer (1) had
the power to hire and fire the employees, (2) supervised and
controlled employee work schedules or conditions of employment, (3)
determined the rate and method of payment, and (4) maintained
employment records." *Bonnette*, 704 F.2d at 1470. In exploring
these factors and determining that each of them weighed in favor of
WRA being a joint employer under FLSA, the *Ruiz* court went into
some detail about the power and authority WRA exercises over the H-
2A sheepherders. The WRA does not substantially dispute the
accuracy of these findings as they are applicable to this
litigation. (*See* P. Reply 5-6.)

1    With regard to "the power to hire and fire the employees," the
2    Ruiz court found that WRA "plays an integral role in initiating H-
3    2A sheepherders' employment with its member ranches." *Ruiz*, 2013
4    WL 2467722, at *8.  WRA has "recruitment coordinators" who go to
5    foreign countries to recruit workers.  *Id.*  These recruitment
6    coordinators work only for WRA, not its member ranches.  *Id.*  The
7    recruitment coordinators provide potential H-2A employees with a
8    document titled "Pre-Employment Notice of Rights and Obligations,"
9    which the sheepherders must sign before they can come to the U.S.
10   *Id.* at *9.

11       "The Pre-Employment Notice generally describes the necessary
         qualifications for the job, the nature of the work that the
12       sheepherder will perform, the wage rate that they will be
         paid, the transportation that will be provided to and from the
13       sheepherder's home country, and the tools, housing, food, and
         insurance benefits that will be provided.  The Pre-Employment
14       notice additionally informs the sheepherder that they are
         guaranteed to '3/4 time employment'; that they are subject to
15       transfer among member ranches; that the sheepherder is to
         contact Western Range if a member ranch no longer has need of
16       them, at which time they will be transferred to another ranch;
         and that the sheepherder shall contact Western Range
17       immediately if the worker has 'any problems' or becomes
         unemployed."
18
     *Id.*  The Notice does state in it that the sheepherder "[is] NOT
19
     employed by Western Range Association but by a MEMBER of Western
20
     Range Association."  *Id.* at *9 n.2.  However, the economic reality
21
     of the joint employment relationship, not the disclaimer, is
22
     controlling on the issue before the court.  *See id.*
23
         After a sheepherder signs the WRA Pre-Employment Notice and
24
     obtains the necessary visa, WRA assigns the sheepherder to a member
25
     ranch of its choosing, arranges for the sheepherder's
26
     transportation to a member ranch, and pays up front for the
27
     transportation (though the member ranches later reimburse WRA for
28

                                    11

travel expenses). *Id.* at *9.  It is legally necessary for WRA to be considered a joint employer of the workers; only an employer of prospective H-2A workers can petition for issuance of H-2A visas. *Id.* at *9; 20 C.F.R. § 655.130-131.  In applying for the H-2A visas, WRA holds itself out as the workers' employer to the Department of Homeland Security.  *Id.* at *10.

Once a sheepherder arrives in the U.S., the sheepherder and the member ranch are required to sign WRA's "Sheepherder Employment Agreement."

> The Agreement allows Western Range to terminate the employment of a worker who commits a willful breach of contract. Moreover, the undisputed evidence establishes that the individual member ranches cannot terminate a sheepherder's employment with Western Range and may only refer the sheepherder to Western Range for reassignment to another ranch . . . When Western Range terminates a sheepherder, it offers the sheepherder prepaid return transportation to their home country.

*Ruiz*, 2013 WL 2467722, at *9.  WRA attempted to minimize its role in firing, claiming that while it can fire employees, it does so only in "'very limited circumstances'" and "'has not done so in recent memory.'"  *Id.*  The *Ruiz* court found that the frequency with which WRA exercises its right to fire is not necessary; the fact that WRA has the power to fire is what is relevant to the economic realities test.  *Id.*

Based on all of this information, this court, as did the *Ruiz* court, finds that WRA does have the power to hire and fire employees.  While WRA clearly has the power to fire based on the Sheepherder Employment Agreement, it also has the power to hire in that it is the "gatekeeper" of the sheepherders' employment in the U.S. and it "sets all key terms of . . . employment through the

Pre-Employment Notice that workers are required to sign before being transported to the member ranch in the U.S." *Id.* at *10.

On the issue of supervision and control of the conditions of the sheepherders, it is clear that while WRA does not supervise or control the "day to day" activities of its H-2A workers, it still, like the agencies in *Bonnette*, "exercised 'considerable control over the structure and conditions of employment.'" *Id.* (citing *Bonnette*, 704 F.2d at 1470). This is so because the WRA Pre-Employment Notice outlines the general terms and conditions of employment with member ranches. *Ruiz*, 2013 WL 2467722, at *10. Additionally, while WRA is not *nominally* a party to the Sheepherder Employment Agreement, it requires H-2A workers and member ranches to enter into the agreement once the workers arrive in the U.S. Furthermore,

> the individual member ranch is identified expressly as a member of the Western Range Association [in the agreement]. Western Range provides the standard form agreement and does not allow the member ranches or workers to deviate from its terms. The agreement sets the terms of employment, the employee's duties, compensation, and other conditions of the sheepherder's employment with the member ranch.

*Id.* at *11. WRA has the power to suspend or terminate the membership of ranchers who violate their conditions. *Id.* Moreover, WRA "serves as a joint guarantor of the employment contract between member ranches and sheepherders." *Id.* It is therefore clear that WRA exercises broad control over the general conditions of employment of the H-2A sheepherders. *Id.*

Further, WRA has significant control of the rate and method of pay even though the member ranches are the ones who – in most circumstances – pay the workers. *Id.* at *12. WRA is required as a joint employer under the H-2A program to ensure that the proper

13

wage rate is followed. *Id.* (citing 20 C.F.R. § 655.135). WRA has the responsibility of ensuring that its member ranches do not pay sheepherders less than required by law. *Ruiz*, 2013 WL 2467722, at *12. If a member ranch fails to pay the correct rate, WRA may compel that ranch to pay it. *Id.* In fact, WRA actually pays a sheepherder's wages if a member ranch does not pay them, or if a gap between a sheepherder's employment at different ranches means that the sheepherder would not otherwise be paid for an extended period of time. *Id.* WRA ensures that sheepherders are still paid wages in the event that a member ranch files for bankruptcy. *Id.* Additionally, WRA requires that member ranches provide worker's compensation insurance to the sheepherders as required by the H-2A rules. *Id.* Finally, WRA provides health and life insurance to sheepherders pursuant to WRA's group insurance plan. *Id.* None of these findings are disputed by WRA. (See P. Reply 5-6.)

With regard to the final *Bonnette* economic realities factor, maintenance of employment records, WRA maintains employment records for all sheepherders. *Id.* The files WRA maintains contain employment contracts, labor certifications, travel information, records of transfers between member ranches, and records of any complaints made by or concerning the sheepherders. *Id.*

Therefore, this court concludes that WRA is a joint employer under FLSA. *Id.* at *14. The critical inquiry into whether or not an employer is a joint employer under FLSA is not which employer the worker is *more* dependent on, but rather the economic reality of each individual worker-employee relationship. *Id.* at *12-13 (citing *Torres-Lopez*, 111 F.3d at 640). This is consistent with the H-2A regulations discussed above, which state that joint

14

employment exists simply "[w]here two or more employers each have sufficient definitional indicia of being an employer to be considered the employer of a worker." 20 C.F.R. § 655.103(b). The joint employers need not have the same amount or degree of indicia of an employer; they merely must each have "sufficient" indicia. *Id.* The economic realities test as articulated in *Bonnette* and applied in *Ruiz* is also consistent with the H-2A regulations' definition of an "employer" as "a[n] . . . organization that . . . [h]as an employer relationship (such as the ability to hire, pay, fire, supervise or otherwise control the work of employee) with respect to an H-2A worker." 20 C.F.R. § 655.103(b).

The undisputed facts discussed in *Ruiz* and presented by the defendants support the conclusion that plaintiff WRA is indeed a joint employer of the H-2A sheepherders and therefore is not eligible to recover under the EAJA. While WRA does not seriously dispute the factual findings of the *Ruiz* Court, WRA does argue that the *Ruiz* court "only decided that there was a genuine issue of material fact on the record before it." (P. Reply. 6.) However, while the *Ruiz* court did determine that there were genuine issues of material fact for trial with regard to several of the *Ruiz* plaintiffs' claims, the court explicitly granted summary judgment to the plaintiffs "insofar as Western Range was a joint employer of Plaintiffs under FLSA." *Ruiz*, 2013 WL 2467722, at *22. Thus the court did make a legal finding based on the facts in evidence that WRA is a joint employer of the H-2A sheepherders under FLSA, and WRA has not disputed the facts leading to that conclusion. *Id.*; P. Reply 5-6.

ii. *Unification Church*

15

Furthermore, *Unification Church*, which plaintiff WRA cites to as articulating a "test" that demonstrates the H-2A sheepherders are not "employees" of WRA under the EAJA, in fact supports a finding that the H-2A sheepherders *are* employees of WRA under the EAJA. *See* P. Reply 4-5; *Unification Church*, 762 F.2d at 1092. The D.C. Circuit found that the Unification Church, the plaintiff in that action, was an employer of its members under the EAJA and therefore not eligible to recover fees under that statute.[3] *See Unification Church*, 762 F.2d at 1092. Without actually stating a test to be used in further analysis, the *Unification Church* court noted that the relationship between the church and its members "resembles a typical employer-employee relationship in all respects save for compensation in kind rather than specie." *Id.* While the relationship between WRA and the H-2A sheepherders may be different from many employer-employee relationships, it is typical of joint employer-employee relationship. *See Ruiz*, 2013 WL 2467722, at *9; 20 C.F.R. § 655.103(b).

Additionally, *Unification Church* supports the conclusion that an entity's status as an employer to workers under other statutory schemes, while not dispositive, is relevant to the inquiry into whether that entity is an employer of the same workers under the EAJA. *Unification Church*, 762 F.2d at 1092 (noting that the district court had been "hasty" in concluding that the Church could not "seek admission of workers under the immigration statutes and then attempt to classify them as non-employees under the Equal

---

[3]   Notably, in making this finding, the court cited to a U.S. Supreme Court case in which "workers at [a] commercial business owned by [a] religious group [were found to be] 'employees' under [the] Fair Labor Standards Act." *Unification Church*, 762 F.2d at 1092 (citing *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290 (1985)).

Access to Justice Act," but that other evidence in combination with these "purely logical grounds" was sufficient to conclude that the Church was an employer of its members and therefore not an eligible party under the EAJA).  Thus, WRA's classification as a joint employer of the sheepherders under the H-2A "special procedures" is relevant evidence in support of a finding that WRA is an employer of those same sheepherders under the EAJA.

**Conclusion**

In the Ninth Circuit, "[t]he party seeking fees [under the EAJA] has the burden of establishing its eligibility."  *Love*, 924 F.2d at 1494 (citing *Thomas v. Peterson*, 841 F.2d 332, 337 (9th Cir. 1988).  However, regardless of which party bears the burden of proof, the undisputed facts in the case at hand support this court's conclusion that plaintiff WRA is an employer of the H-2A sheepherders and as such had more than 500 employees at the time of filing the instant action.  WRA is therefore not a "party" eligible to recover fees under the EAJA.[4]  *See* 28 U.S.C. § 2412(d)(2)(B)(ii).

Having so concluded, it is unnecessary for the court to decide whether plaintiff WRA "prevail[ed]" in this litigation, whether the position of the United States in this matter was "substantially

---

[4] The court believes this finding is consistent with the "[t]he central objective of the EAJA[, which is] to encourage relatively impecunious private parties to challenge unreasonable or oppressive governmental behavior by relieving such parties of the fear of incurring large litigation expenses." *Spencer v. N.L.R.B.*, 712 F.2d 539 (D.C. Cir. 1983); P. Mot. 5.  With its large employee roster, the WRA is not the sort of "relatively impecunious private party" the EAJA was meant to assist in pursuing meritorious litigation that would otherwise be impossible due to cost.  "[T]he intent of the EAJA is to assist individuals or small entities, not to subsidize large entities that are better able to afford legal services." *Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Admin.*, 675 F.3d 1036, 1040 (7th Cir. 2012) (citing *Unification Church*, 762 F.2d at 1081); D. Opp'n 11.

justified," or whether there are any "special circumstances [that] make an award unjust." *See id* at § (d)(1)(A).  It is also unnecessary for the court to make any inquiry into the reasonableness of the fees and costs requested.

On the basis of the foregoing, plaintiff WRA's Motion for Fees and Costs Pursuant to the Equal Access to Justice Act (#42) is **DENIED.**

**IT IS SO ORDERED**.

DATED: This 27th day of January, 2014.

_____
UNITED STATES DISTRICT JUDGE